# EXHIBIT 1



# Notice of Service of Process

**TV / ALL**
**Transmittal Number: 26457709**
**Date Processed: 02/27/2023**

| | |
|---|---|
| **Primary Contact:** | Kristina Cates<br>Laboratory Corporation of America Holdings<br>531 S Spring St<br>Burlington, NC 27215-5866 |
| **Electronic copy provided to:** | Anetta Outlaw<br>Heather Long<br>Mary Beth Maines |

| | |
|---|---|
| **Entity:** | Laboratory Corporation of America<br>Entity ID Number  0035873 |
| **Entity Served:** | Laboratory Corporation Of America |
| **Title of Action:** | Allon Hull vs. Laboratory Corporation of America |
| **Matter Name/ID:** | Allon Hull vs. Laboratory Corp. of America (13665574) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court/Agency:** | Riverside County Superior Court, CA |
| **Case/Reference No:** | CVRI2300867 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 02/24/2023 |
| **Answer or Appearance Due:** | 30 days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Bryant Whitten LLP<br>559-494-4910 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Electronically FILED by Superior Court of California, County of Riverside on 02/21/2023 12:01 PM
Case Number CVRI2300867 0000049545280 - Marita C. Ford, Interim Executive Officer/Clerk of the Court By Elizabeth Marquez, Clerk

1    **SHELLEY G. BRYANT - #222925**
      **BRYANT WHITTEN, LLP**
2    8050 North Palm Avenue, Suite 210
      Fresno, California 93711
3    (559) 494-4910 Telephone
      (559) 421-0369 Facsimile
4    Email: shelley@bwlaw.com

5

6    Attorneys for Plaintiffs, ALLON HULL and CHRIS SCHOTT

7

8            SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

9

10   ALLON HULL, and CHRIS SCHOTT,     )    Case No. CVRI2300867

11           Plaintiffs,              )    **COMPLAINT FOR FAILURE TO PAY SALES COMMISSIONS BECAUSE**

12   vs.                          )    **IT'S SIMPLY TOO MUCH MONEY TO PAY, BREACH OF CONTRACT**

13   LABORATORY CORPORATION OF   )    **(WRITTEN, ORAL, IMPLIED IN-LAW**

14   AMERICA, a Delaware Corporation, and Does )    **AND FACT) IN VIOLATION OF**
    1 through 20, inclusive,            )    **LABOR CODE § 2751, B&P CODE §**

15           Defendants.             )    **17200 et seq, FRAUDULENT MISREPRESENTATION,**

16                                          )    **NEGLIGENT MISREPRESENTATION, QUANTUM**

17                                          )    **MERUIT, UNJUST ENRICHMENT, PUNITIVE DAMAGES AND ATTORNEYS' FEES**

18
                                         **DEMAND FOR JURY TRIAL**

19

20       **COMES NOW** Plaintiffs, ALLON HULL and CHRIS SCHOTT, and allege as follows:

21                                    <u>**PARTIES**</u>

22       1.      Plaintiff, ALLON HULL, is an adult female and was at all times herein mentioned a

23   resident of the County of Riverside, State of California. This Plaintiff was employed in Riverside

24   County by Defendants from approximately November 2015, to present. She currently works as a

25   Regional Business Development Executive ("RBDE").

26       2.      Plaintiff, CHRIS SCHOTT, is an adult male and was at all times herein mentioned a

27   resident of the State of California. Plaintiff was employed by Defendants in the State of California

28   from approximately November 2001, to present. He currently works as a Sales Manager. Plaintiffs,

---

1    HULL and SCHOTT, collectively, are hereinafter referred to as "Plaintiffs."

2          3.      Defendant, LABORATORY CORPORATION OF AMERICA (hereinafter referred

3    to as "LabCorp"), is a Delaware Corporation, doing business in RIVERSIDE County, California.

4          4.      Venue is proper in this county because: (1) Plaintiff HULL resides and worked for

5    LabCorp in RIVERSIDE County; (2) the injuries of Plaintiff HULL occurred in RIVERSIDE County;

6    and (3) the employment agreement between LabCorp and Plaintiff HULL was formed and to be

7    performed in RIVERSIDE County. This court is the proper court because the amount at issue exceeds

8    the jurisdictional minimum of this court.

9          5.      The true names and capacities of the Defendants named herein as Does 1 through 20,

10   inclusive, whether individual, corporate, associate or otherwise, are unknown to the Plaintiffs who,

11   therefore, sues such Defendants by fictitious names pursuant to California Code of Civil Procedure

12   §474. Plaintiffs are informed and believes, and on that basis alleges, that each Defendant sued under

13   such fictitious name is in some manner responsible for the wrongs and the damages as alleged below,

14   and in so acting was functioning as the owner, shareholder, principal, agent, servant, partner, joint

15   venturer, alter-ego, employee, proxy, managing agent, and principal of the co-Defendants, and in

16   performing the acts mentioned below was acting, at least in part, within the course and scope of such

17   authority as such agent, proxy, servant, partner, joint venturer, employee, alter-ego, managing agent,

18   and principal with the permission and consent of the co-Defendants.

19         6.      Plaintiffs are informed and believe, and thereupon allege, that each of the Defendants

20   sued herein was, at all times relevant hereto, the employer, owner, shareholder, principal, joint

21   venturer, proxy, agent, employee, supervisor, representative, manager, managing agent, joint employer

22   and/or alter-ego of the remaining Defendants, and was acting, at least in part, within the course and

23   scope of such employment and agency, with the express and implied permission, consent and

24   knowledge, approval and/or ratification of the other Defendants. The above co-Defendants, managing

25   agents, and supervisors aided, abetted, condoned, permitted, approved, authorized and/or ratified the

26   unlawful acts described herein.

27         7.      At all times herein, Plaintiffs were duly qualified and did perform their employment

28   duties in a satisfactory manner. Plaintiffs performed and were willing to continue to perform all duties

1  and responsibilities on their part to be performed, which duties and responsibilities were part of the

2  employment relationship between Defendants and Plaintiffs.

3      8.    Plaintiffs were, at all times herein, an employee covered by the Labor Code and all of

4  the protections it affords employees working in the state.

5      9.    Defendants were at all times herein mentioned, an employer within the meaning of the

6  Labor Code, as such, statutorily required to comply with the provisions mentioned therein.

7  **Any Employer That Agrees To Pay Commissions To Employees In California Must Have A Contract Signed By The Employee**

8

9      10.    For decades, big companies like Laboratory Corporation of America ("LabCorp") have

10  used sales employees to grow their businesses. The companies promised big commissions as

11  incentive to meet and exceed sales goals. Sales employees often dream of making the big sale so that

12  they can earn big commissions, and they often work day and night for their employers.

13      11.    Historically, the companies have done well because of the sales employees. Many have

14  grown into multi-billion-dollar corporations with publicly traded stock, others remain private. Either

15  way, corporate greed and/or Wall Street pressure to increase profits causes these companies to spend

16  inordinate amounts of time, money and energy to grow the business. Some companies are willing to

17  do anything, including breaking the law, just to increase.

18      12.    During the same period, the sales employees have not done well. Many have been

19  cheated out of their commission by big companies in ways that will shock the conscience. For

20  example, IBM created a compensation contract for sales executives, but then claimed it not a contract

21  at all. The company told sales executives that their commissions were not capped, but then refused

22  to pay full commissions on big deals. These topics, and others, have led to decades of litigation and

23  court decisions that mostly favored IBM and the big companies. Several of these IBM cases were

24  filed in North Carolina courts and/or decided based upon North Carolina law. LabCorp has its

25  headquarters in North Carolina.

26      13.    In 1963, the Legislature in the Great State of California discovered that many

27  out-of-state companies were hiring folks to sell goods and services within the state, promised big

28  commissions, and then refused to pay up. The employees were left with the impossible task of chasing

PLAINTIFFS' COMPLAINT              Page 3

1    down foreign corporations in hopes of getting paid so they could feed themselves and their families.

2    14.    That year, Labor Code §§ 2751 and 2752 were enacted "to prevent out-of-state

3    employers from deceiving employees compensated through commissions by requiring a written

4    employment contract." 2011 Cal ALS 556, 2011 Cal AB 1396, 2011 Cal Stats. ch. 556  The latter

5    provision called for treble damages for violations.  These laws remained in effect for a long time, but

6    only required written contracts for companies with no fixed place of operation in California.

7    15.    In 1999, the United States District Court in the Northern District of California found

8    that Labor Code § 2751 violated the US Constitution, specifically by violating the equal protection

9    clause and commerce clause, thereby making the code section unenforceable.  Essentially, the court

10   found that provisions discriminated against out-of-state companies.

11   16.    About a decade later, several states, including Georgia, Louisiana, Maryland,

12   Tennessee, and then California, passed laws requiring all employers to have written

13   commission-based employment contracts.  These states believed that such measures were " needed

14   in order to protect employees from fraud and abuse, as well as protect employers from unnecessary

15   litigation resulting from vague oral contracts."  Ibid.  California eliminated the treble damages

16   provision and required all employers, in and out of state, to comply.  The legislative history says:

17   [T]he intent of this bill is to restore the employee protections that had been in effect prior to that

18   holding by making Section 2751 of the Labor Code apply with equal force to employers with a fixed

19   place of business in the state and to employers who do not have a fixed place of business in the state.

20   17.    The amended Section 2751 became operative on January 1, 2013. Its says exactly what

21   the Legislature intended:

22          (a) Whenever an employer enters into a contract of employment with an
       employee for services to be rendered within this state and the contemplated method of
23     payment of the employee involves commissions, the contract shall be in writing and
       shall set forth the method by which the commissions shall be computed and paid.
24
25          (b) The employer shall give a signed copy of the contract to every employee
       who is a party thereto and shall obtain a signed receipt for the contract from each
       employee. In the case of a contract that expires and where the parties nevertheless
26     continue to work under the terms of the expired contract, the contract terms are
       presumed to remain in full force and effect until the contract is superseded or
27     employment is terminated by either party.

28   ///

18.    This was kind of an earth-shattering event for all companies who employed sales people within the State of California.  Almost all of the big law firms for employers told the companies about the change.

19.    In November 2011, the big law firm of Jones Day published its "2011 California Labor and Employment Legislative Update" for big employer clients.  The update said:

> The new statute requires that, by January 1, 2013, any employer who enters into a contract of employment involving commissions as a method of payment must put the contract in writing. The written agreement must set forth the method by which commissions are computed and paid. . . .

> The new law applies to all employers with commissioned employees in California, whether or not the employer is located in California. Labor Code 2751 also requires the employer to provide a signed copy of the employment agreement to each employee who is a party to it. It specifies that if the contract expires but the parties continue to perform under its terms, the contract's terms are presumed to remain in full force until a new contract superseding its terms is executed or either party terminates the employment relationship.

20.    A few months later, big law firm Shepard Mullin published a paper for employers entitled: "New California Commission Contract Rules - It is Not TooEarly To Get Ready!"  The first line of the paper said: "Employers with sales teams in California need to get ready. California has a new commission contract law . . ."  The law firm warned:

> . . . Here's the tricky part. Going forward, **when a contract governing commissions expires without being replaced but the employee continues work, the terms of the "expired" contract will apply to commissions until the parties sign a new agreement** or until the employment is terminated. . . .

> The Legislature believes AB 1396 will protect employees from fraud and abuse and employers from unnecessary litigation resulting from vague oral contracts. (emphasis added)

21.    In December 2012, the big law firm of Payne Fears published an "Insights" paper for employers entitled: "BEGINNING ON JANUARY 1, 2013, COMMISSION AGREEMENTS FOR CALIFORNIA EMPLOYEES MUST BE IN WRITING AND SIGNED."  The law firm warned employers:

> What To Do By January 1, 2013?

> With the January 1, 2013 deadline rapidly approaching, employers should ensure that written commission agreements which comply with section 2751 are in place before the deadline. For employers that already have a written commission agreement, it is also a good time to review the agreement to ensure it complies with the new law.

Written commission agreements should include . . . . Employers must provide signed copies of the agreement to the employee and require that the employee sign an acknowledgment confirming receipt of a signed copy of the agreement.

22.    That same month, big law firm Perkins Coie published a paper for employers entitled:

"California Law Soon To Require Written Contracts For Employees Paid On Commission (AB 1396;

Cal. Labor Code§ 2751)." This warning was clear:

On January 1, 2013, all employers with employees in California who are paid by commission will be required to have written contracts with those employees. **This law is a significant departure from the previous law**, which only required employers based outside of California to have written contracts with their commissioned employees. . . . (emphasis added)

**Potential penalties for non-compliance**. While the statute does not set forth specific penalties, an employer risks exposure for allegedly unpaid or late commissions, damages under California's Unfair Competition Law (UCL), or penalties under California's Private Attorney General Act (PAGA), as well as associated attorneys' fees.

23.    In February 2013, a month after the new law went into effect, big law firm Gordon

Rees published a paper entitled: "New Legislation Requires Written Agreements on Compensation."

It clearly advised companies with employees in California to get advice from an attorney:

***Employers Must Memorialize Commissioned Employees' Wages***
Effective Jan. 1, new legislation restored a regulation requiring California employers to provide written agreements to all employees earning commissions. The law, AB 1396, revises and reinstates §2751 of the California Labor Code, which a federal court found unconstitutional in 1999.

In light of these new requirements, California employers, and employers with employees working in the state of California, should provide all employees with written compensation agreements and memorialize existing agreements with commissioned employees. Employers are urged to consult with counsel to determine whether they may need assistance in drafting updated commission agreements or updating their employee handbooks.

24.    In July 2014, even after the dust settled, the California Chamber of Commerce

reminded employers of the new requirement and published a paper entitled: "Don't Forget: Put

Commission Agreements in Writing." It was clear like the others:

The law amended Labor Code section 2751 to provide that any employee hired to perform work for commissions in California must receive a written contract that includes the method for calculating and paying the commissions.

***This legal requirement contains a number of potential pitfalls that could result in wage-and-hour lawsuits ...***

1  The employer must give the employee a copy of the contract and obtain a signed
   acknowledgment from the employee that he/she received the contract.
2

3      25.    In November 2018, Jerome Beard sued IBM after the company whittled down his

4  commission from $2,901,806 to $410,572, because it was "simply too much money to pay." Beard

5  was a salesman for IBM, made two big sales that should have earned him the $3 million commission.

6  However, IBM retroactively capped his commissions and paid a fraction of what was owed.  Beard

7  sued for, inter alia, breach of contract, violations of Labor Code section 2751, and Unfair Competition

8  Law (B&P Code section 17200 et seq.).  IBM moved for summary judgement of Beard's claims.

9      26.    In March 2019, the prominent big employment law firm, Seyfarth Shaw, published an

10 annual catalogue about how California law deviates from prevailing American labor and employment

11 law. It was extensive (356 pages).  On page 218 of the catalogue, the law firm provided a breakdown

12 of Labor Code provisions, placing them into categories, including "Required employer disclosures."

13 That section says this about Section 2751: "Contract of employment for commissions. California

14 employers paying commissions must put the commission arrangement in a written contract and give

15 the employee a signed copy."  This catalogue was used to train human resources personnel.

16     27.    In June 2019, something big happened - the Beard case made headlines. IBM

17 successfully convinced the court that Beard's compensation plan was not a contract and the breach of

18 contract claim was dismissed.  Beard successfully argued that, since his commission plan was not a

19 contract, IBM was in violation of Section 2751, and that he should be paid the full commissions under

20 other equitable legal theories.   One blogger, the Vigilant Blog:News, trends and analysis in

21 employment law, HR, safety & workers' comp, posted with this heading: "Q&A: Say what you mean

22 in commission agreements."  The post summarized the news about Beard concisely:

23     ***Words of Caution***

24     In a recent California case, the company whittled down a star salesperson's
       commission from $2,901,806 to $410,572, because it was simply too much money to
25     pay.   The employee sued, noting that a PowerPoint presentation stated that
       commissions would be uncapped. The company tried to dismiss his complaint because
26     its written commission plan gave the company the right to modify or cancel the plan.
       A federal district judge mostly sided with the employee and allowed several claims to
27     continue forward. The employee may now show that the company engaged in negligent
       misrepresentation and was unjustly enriched by its actions. The employee can also
28     proceed with a claim that the company violated California Labor Code 2751 by failing
       to state in writing "the method by which the commissions shall be computed and paid."

1      This California state law requires most commission agreements to be in writing, with a signed copy of the contract given to affected employees, and a receipt obtained in
2  return (Beard v. IBM Corp., ND Cal, April 2019).

3      . . . Need a second opinion? Vigilant members should contact their dedicated employment law attorney
4

5      28.    In August 2019, another news story arose when David Swafford sued IBM in California

6  for essentially the same thing as Beard.

7      29.    In November 2019, Business Wire reported that the case Swafford filed against IBM

8  was settled out of court to the parties' mutual satisfaction.

9      30.    In April 2020, several web sites reported that another case had been filed against IBM

10  and the Beard case was headed to trial. The Register summarized the events this way:

11      This has been going on for more than 15 years, according to a separate complaint in a similar case, Mark Comin v IBM. Yet, paperwork submitted in the Comin case stated
12  IBM's insistence that it has no contract with its sales people has put the company into "a Catch-22 of its own making."
13

14      Section 2751 of the California Labor Code, enacted in 2013, requires employers provide a written contract that spells out commission payments. The recent Comin
15  filing [PDF] stated: "[I]f IBM has no commissions contract, as IBM has convinced so many courts, then it has perfected its own violation of Section 2751 in California."

16      IBM has tried to get around this by insisting its non-contract is a contract for the purpose of satisfying California law, but isn't a contract such that it makes its
17  commission terms enforceable.

18      "IBM is trying to walk this very fine line that with regard to Section 2751, it has a contract, but no contract for any other purpose," explained Matthew E. Lee, a partner
19  at Whitfield Bryson & Mason LLP and one of the attorneys representing Beard and Comin, in a phone interview with The Register. "I don't understand that and, in my
20  experience, judges don't either. They either have a contract or don't have a contract."

21      Indeed, Judge Alsup in his order this week accepted IBM position that the tech titan's disclaimer means its IPL isn't a contract and accordingly rejected IBM's effort to claim
22  the IPL is a contract just for the purpose of satisfying California law. "Since Section 2751 requires a 'contract' to satisfy its requirements, the IPL cannot do," his order in
23  the Beard case stated.

24      Lee said a jury will now have the opportunity to decide whether what IBM has been doing is lawful, though he allowed that IBM may decide to settle. Only about four per
25  cent of federal cases end up going to trial, he said.

26      31.    A few points are clear. First, in the State of California, an employer of sales people

27  paid by commission must have a signed contract. Second, employers have been on notice of this

28  requirement since 2012. Third, there is no plausible way for Defendant, Laboratory Corporation of

---

**PLAINTIFFS' COMPLAINT**                                                                                                  Page 8

1    America to claim that it did not know of the contract requirement.

2    **LabCorp Knew That A Signed Commission Contract Was Required**

3         32.    LabCorp has a huge in-house legal team that tracks employment laws throughout the

4    United States and in California. The team members routinely receive news and updates about

5    employment laws from a variety of sources including law firms, Linkedin, the Chamber of Commerce,

6    professional blogs, news sources, in-house updates, and the like. The team is led by Chief Legal

7    Officer Sandra van der Vaart who has been with LabCorp for about 20 years. She earned a law degree

8    from the University of Virginia. Others on the team have law degrees and legal backgrounds. They

9    gave LabCorp executives, managers, supervisors and employees advice about administration and

10    application of these policies and pay plans. They used the updates along with their education, training,

11    experience to draft personnel policies and pay plans for employees. They knew of California's written

12    contract requirement for commission pay and the events of above, but consciously decided to pay

13    Plaintiffs and others by commission without a signed contract. They knowingly violated the law.

14         33.    LabCorp has a huge Human Resources team that tracks employment laws throughout

15    the United States and in California. The HR team members routinely receive news and updates from

16    a variety of sources including law firms, Linkedin, the Chamber of Commerce, professional blogs,

17    news sources, in-house updates, and the like. The team is led by the Chief Human Resources Officer,

18    Judi Seltz. She earned a masters degree in Human Resources Management. They used the updates

19    along with their education, training, experience to draft personnel policies and pay plans for

20    employees. They gave LabCorp executives, managers, supervisors and employees advice about

21    administration and application of these policies and pay plans. They knew of California's written

22    contract requirement for commission pay and the events of above, but consciously decided to pay

23    Plaintiffs and others by commission without a signed contract.

24         34.    Labcorp has a whole National Sales Administration Team to deal with its large

25    commissioned sales force. The Sales Admin Team members routinely receive news and updates from

26    a variety of sources including law firms, Linkedin, the Chamber of Commerce, professional blogs,

27    news sources, in-house updates, and the like. They used the updates along with their education,

28    training, experience to draft pay policies and pay plans for employees. They gave LabCorp executives,

1   managers, supervisors and employees advice about administration and application of these policies

2   and pay plans. They decided the amount of commission pay, the method for calculating commissions,

3   and whether a representative should receive, forfeit, return, or be denied commission pay. They

4   created complex schemes and calculations for determining the amount of commissions. They created

5   data banks from sales records and connected them to calculators so that LabCorp and commissioned

6   sales employees could calculate the amounts owed for commissions based on revenue data. They

7   controlled access to these calculators and that revenue data. They helped LabCorp make decisions

8   whenever it was necessary to recalculate, recover, offset, or deny payment of commissions. They

9   knew of California's written contract requirement for commission pay and the events of above, but

10  consciously decided to pay Plaintiffs and others by commission without a signed contract.

11  **LabCorp Made A Contract Of Employment With Plaintiffs**
    **For Sales Services and The Payments Involved Commissions**

12

13      35.     LabCorp provides comprehensive clinical laboratory and end-to-end drug development

14  services. It employs sales representatives with the title of Regional Business Development Executive

15  (RBDE) within the state. The RBDEs are primarily responsible for new account acquisition through

16  business development by representing Labcorp's Value-Based Care Programs and Services. The

17  business prospects include Accountable Care Organizations (groups of doctors, hospitals, and other

18  health care providers, who come together voluntarily to provide coordinated care), Federally Qualified

19  Health Centers (federally funded nonprofit health centers or clinics that serve medically underserved

20  areas and populations) and Large Complex customers that are affiliated with the Value Based Care

21  (a health care delivery model under which providers - hospitals, labs, doctors, nurses and others - are

22  paid based on the health outcomes of their patients and the quality of services rendered of the

23  business) segment. RBDEs have close interaction with the leadership of all internal, external, and

24  laboratory operations in collaboration with sales and operational teams to ensure client growth and

25  service delivery. RBDEs are responsible for the independent contribution of new sales growth, with

26  collaboration amongst regional sales team for presentations, client development, and service

27  implementation, and must develop and maintain a strong, accurate pipeline of potential clients .

28  LabCorp employs Regional Managers of Business Development (RMBD) which is a key leadership

1  position with responsibility for overseeing regional sales and account management professionals while

2  working with the Area Director to implement and drive strategic initiatives and launch new products

3  in conjunction with a fully integrated portfolio of specialty and esoteric testing laboratories.

4       36.    Practically speaking, RBDEs are hired to sell and educate clients on diagnostic testing.

5  RMBDs are hired to oversee the performance of Sales Marketing Executives (SME) and Key Account

6  Executives (KAE). That is what they spend most of their time on and is the most important part of

7  the job.

8       37.    LabCorp created a contract of employment with Plaintiffs, and employed Hull as an

9  RBDE and Schott as an RMBD. Plaintiff HULL worked in Corona California. Plaintiff SCHOTT

10  worked in the San Diego area. The RBDEs secured new business in their territories by selling

11  laboratory testing services of LabCorp, RMBDs coach, develop and motivate SMEs and KAEs to sell

12  and retain.

13       38.    Plaintiff Hull and other commissioned employees were told, by company executives,

14  that they would be paid commissions for selling these lab services. LabCorp promised to pay, and

15  actually paid, Plaintiff Hull a 7% commission on all growth sales in excess of $5,000. LabCorp

16  promised to pay, and actually paid, Plaintiff Schott a quarterly bonus based on a fixed percentage of

17  sales or profits as compensation for work to be performed. LabCorp and Plaintiffs used company

18  databases and records of sales and revenue to calculate the commissions and bonuses due Plaintiffs.

19  LabCorp made all of this information available to Plaintiffs without limitation. This conduct by

20  LabCorp and Plaintiffs shows an agreement or understanding that created an obligation for LabCorp

21  to pay Plaintiffs and other RBDEs and RMBDs the commissions and bonuses, and the parties had an

22  expressed or implied contract.

23       39.    Prior to 2020, the parties conducted themselves consistent with this employment

24  contract for services in exchange for the commission pay mentioned above. This course of conduct

25  cemented the terms of the employment contract indelibly.

26       40.    Pursuant to the employment contract, LabCorp encouraged RBDEs and RMBDs

27  including Plaintiffs, to sell as much as possible in order to exceed sales goals. Plaintiff Schott was told

28  that quota was bare minimum, which is just enough to remain employed. He was also told of "stretch"

---

**PLAINTIFFS' COMPLAINT**

1  goals, which meant he should far exceed goals to cover any potential losses during the year.  Zac

2  Chambers, a manager in the National Sales Admin office, and Divisonal senior leaders routinely

3  encouraged Plaintiffs and others to sell as much as possible.  Even when quota had been exceeded by

4  almost 125% to 400%, LabCorp encouraged more sales.  Plaintiff understood this to mean that there

5  was no limit to how much money they could earn from commissions.

6      41.    The company has a "GEM Club" awards program for top sales personnel to receive

7  recognition for making big sales and earning large commissions, gifts and all expenses paid trips and

8  vacations.  The GEM club announces top performers to all employees.  The managers over RBDEs

9  and RMBDs often talked about "sky's the limit" when referring to commissions and the awards

10  program.  Top performers received bonuses in addition to the commissions.  Over the years, Plaintiff

11  Hull received countless awards including, Best of Class, Top Performers and GEM club, because she

12  exceeded sales goals.

13      42.    The parties documented the compensation terms of their employment contract.  On an

14  annual basis, LabCorp required Plaintiff Hull and other RBDEs to sign a document entitled "Incentive

15  Compensation Plan."  The Plan describes the commission payments and method for calculating

16  commissions.  LabCorp required Plaintiff Schott and other RMBDs to sign a document entitled

17  "Incentive Bonus Plan."  The Plan describes the sales bonus and method for calculating incentive

18  compensation.

19      43.    Plaintiffs believed the Plans were required to document the terms of their employment

20  contract for commission pay in exchange for services, and they believed it was part of that contract,

21  because the RBDE Plan document says:

22      **Plan Introduction**
       **Plan Objectives**

23

24      The Regional Business Development Executive . . . Compensation Plan provides
       incentive compensation for qualified individuals who produce new sales revenue in
       prospective accounts.

25

26      The Plan describes the current parameters by which LabCorp commissions are paid to
       RBDEs . . .

27      Commissions are paid on a monthly basis.

28      **Plan Details**
       **Sales Commission**

PLAINTIFFS' COMPLAINT                                                              Page 12

**Retention Commission**

Once a Qualified Account has been fully approved, the account will Track for a period of 12 months after the Credit Submission.

An RBDE-W will earn a Commission Rate of up to 7.0% of the Qualified Account's New Sales Revenue

**Administrative Details**

11. The Plan memorializes a pay practice and policy of LabCorp. The Plan does not create any contract or agreement between LabCorp and the RBDE nor does the RBDE-W have any contractual rights under the Plan. RBDE-Ws are employed at-will and either the RBDE-W or LabCorp may terminate the employment relationship at any time. LabCorp reserves the sole right to amend, supersede or terminate the Plan, in whole or in part, upon written notice to the affected RBDE-Ws. LabCorp has the sole power to construe and interpret this Plan and to determine all questions that may arise under this Plan. Such interpretations and determinations will be conclusive and binding upon all parties including any RBDE-Ws affected by the plan.

This Plan may not be modified in any way without the express written approval of the National Sales Administration in Burlington, NC.

12. No RBDE-W employee shall be eligible to receive incentive compensation under this plan unless and until he/she executes and returns the attached 2017 Regional Business Development Executive-W Compensation Plan Acknowledgment of Understanding Form.

13. The Compensation Plan, all prior compensation plans and any amendments to this Compensation Plan or prior compensation plans shall be construed in accordance with the laws of the State of North Carolina, without reference to that jurisdiction's choice of law provisions. (emphasis added)

15. The plan is effective January 1, 2017 and supersedes all other prior incentive compensation plans for RBDE-Ws. All other prior incentive compensation plans are hereby terminated and a RBDE-W shall not be entitled to any incentive compensation payment under any prior incentive compensation plan. RBDE-Ws will be paid only under this plan beginning with the January 2017 incentive payout.

The Regional Manager Business Development Commission Plan says:

**Plan Objectives**

The 2021 Commission plan was designed to support the following objectives:
- Motivate exceptional performance
- Align representative payouts with LabCorp's performance
- Simplify the incentive compensation process by which representatives are paid

**Plan Overview**

The incentive plan is a bonus based plan. Bonuses will be paid for attainment in excess of established targets.

**Plan Details**
**Sales Bonus**

1    A Sales bonus will be calculated based on actual performance measured against targets or goals.

2

3    **Payment Timing**

4    Incentive compensation, once earned, will be payable seventy-five - ninety (75-90) days after the end of the tracking period. Because conditions may occur resulting in delayed payment, the company reserves the right in its sole discretion to adjust the payment schedule.

5

6    **Administrative Details**

7    14. The Plan memorializes a pay practice and policy of LabCorp. The Plan does not create any contract or agreement between LabCorp and the employee nor does the employee have any contractual rights under the Plan. Employees are employed at-will and either the employee or LabCorp may terminate the employment relationship at any time. LabCorp reserves the sole right to amend, supersede or terminate the Plan, in whole or in part, upon written notice to the affected employees. LabCorp has the sole power to construe and interpret this Plan and to determine all questions that may arise under this Plan. Such interpretations and determinations will be conclusive and binding upon all parties including any employees affected by the plan.

8

9

10

11

12    This Plan may not be modified in any way without the express written approval of the National Sales Administration in Burlington, NC.

13

14    15.    LabCorp reserves the right for management to review and amend quarterly and annual targets to better align the sales targets to actual data. These adjustments are meant to better align the business needs.

15

16    17. The Compensation Plan, all prior compensation plans and any amendments to this Compensation Plan or prior compensation plans shall be construed in accordance with the laws of the State of North Carolina, without reference to that jurisdiction's choice of law provisions. (emphasis added)

17

18    18. No employee shall be eligible to receive incentive compensation under this plan unless and until he/she executes and returns the attached 2021 Sales Incentive Bonus Plan Acknowledgement of Understanding Form and addendum.

19

20    19. The plan is effective January 1, 2021 and supersedes all other prior incentive compensation plans for EMPLOYEE-Ws. . . .

21

22    44.    LabCorp intentionally drafted the Plan documents in a manner that was likely to lead

23    the RBDEs and RMBDs into thinking that it was part of the employment contract.  LabCorp

24    intentionally mixed language about at-will status and continued employment to surround the language

25    that says the Plan does not create a contract in order to confuse RBDEs and RMBDs into thinking the

26    paragraph was there simply to say the Plan does not create a right of continued employment.

27    45.    Plaintiffs understood the Plan to mean nothing more that the Plan did not guarantee

28    them a right to continued employment because it says "[RBDEs or employees] are employed at-will

1  and either the [RBDEs or employee] or LabCorp may terminate the employment relationship at any

2  time" right after stating that "The Plan does not create any contract or agreement between LabCorp

3  and the [RBDE or employee] nor does the [RBDE or employee] have any contractual rights under the

4  Plan" and right before stating that LabCorp reserves the right to amend, supersede or terminate the

5  Plan, in whole or in part, upon written notice to the affected RBDEs and RMBDs.

6    46.    A contrary reading, that the Plan is not a contract and creates no contractual rights,

7  would be a surprise to Plaintiffs because the supposedly agreed upon terms of the bargain are not

8  represented in the form drafted by LabCorp. This interpretation is so harsh and one-sided that it would

9  shock the conscience and such an interpretation of the terms is not justified by the circumstances.

10    47.    Plaintiffs have no legal training or experience with the law or contracts. They did not

11  draft the Plan and played no role in drafting it. LabCorp drafted the Plan without input from Plaintiffs.

12  LabCorp used the legal team, HR team, and sales administration team to draft the Plan. They knew

13  that RBDEs and RMBDs thought the Plan was a contract as mentioned in the paragraphs below.

14    48.    Each year, LabCorp waited months after January 1st to send the Plan to Plaintiffs and

15  other RBDEs and RMBDs and insisted the RBDEs and RMBDs needed to sign and return the

16  documents in order to get paid for the commissions they had already earned on or after January 1st

17  that year. In other words, LabCorp told Plaintiffs that the Plan documents were retroactive to January

18  1st each year.

19    49.    LabCorp intentionally timed the correspondence about the Plan and signing the

20  documents so that commissioned employees would rush to sign the documents believing the rush was

21  necessary in order to be paid for commissions already earned.

22    **The Employment Contract Remained In Full Force And Effect In 2020**

23    50.    In 2020, Plaintiffs and LabCorp continued their conduct pursuant to the employment

24  contract for services in exchange for commission payments. Plaintiffs worked as RBDEs and RMBDs

25  and continued to secure new business and LabCorp continued to pay the 7% commission and quarterly

26  bonus.

27    51.    In or about April 2020, LabCorp sent a Plan document for Plaintiffs to sign and said

28  that Plaintiff would not be paid for the commissions they had earned after January 1, 2020, unless and

1    until they signed and returned the Plan.

2          52.    At the time LabCorp asked Plaintiffs to sign the Plan, based on all of the events

3    mentioned in paragraphs 10 through 34, it is clear that LabCorp knew that a signed contract was

4    required in order to pay RBDEs and RMBDs commissions as described in the Plan.

5          **COVID-19 Stay At Home Orders Caused Revenue To Drop**
      **LabCorp Told Plaintiffs To Build A Book Of Business From COVID Testing**
6

7          53.    On December 31, 2019, the World Health organization stated that a mysterious

8    pneumonia was sickening dozens of people in Wuhan, China.

9          54.    On January 26, 2020, the Centers for Disease Control confirmed California's first case

10   of coronavirus in Orange County. The patient is a traveler from Wuhan, China.

11         55.    On January 30, 2020, the World Health Organization declared a "public health

12   emergency of international concern."

13         56.    On February 11, 2020, the World Health Organization formally renamed the novel

14   coronavirus COVID-19. "Co" stands for coronavirus, "Vi" is for virus and "D" is for disease.

15         57.    On March 4, 2020, Governor Gavin Newsom declared a state of emergency in

16   California.

17         58.    On March 5th, 2020, LabCorp announced that it was offering COVID PCR testing,

18   which was made available pursuant to guidance issued by the U.S. Food and Drug Administration and

19   the CDC.

20         59.    Plaintiffs went to work immediately. They worked day and night to establish regional

21   PCR testing sites for the County of Riverside and Bearie Healthcare. This was a nightmare because

22   these entities were unsure about funding, requirements, staffing and other important issues. Plaintiffs

23   assisted with every aspect of setting up testing, from assigning account numbers to arranging for

24   delivery of supplies in the middle of the night and collecting payments, which as not normally a big

25   part of their jobs. The established new PCR testing accounts for clients like Corona Community

26   Health Center and Hemmet Community Health Center and Yucaipa Urgent Care as part of a corporate

27   sales strategy to prevent competitors like Quest and Eagis from signing up these new clients. Plaintiffs

28   also worked tirelessly to prevent existing clients from leaving LabCorp or using competitors for PCR

1    testing. But for the timely valiant efforts of Plaintiffs, LabCorp would have missed out on $30 million

2    dollars in PCR testing revenue from Plaintiffs region.

3         60.    On March 13, 2020, President Trump declared the ongoing Coronavirus Disease 2019

4    (COVID-19) pandemic of sufficient severity and magnitude to warrant an emergency declaration

5    for all states, territories, and the District of Columbia.

6         61.    On March 16, 2020, a shelter in place order was announced for six Bay Area counties.

7    A few days later, Gov. Gavin Newsom announced a statewide order to shelter at home, affecting 40

8    million Californians. The order restricted all non-essential travel and activities outside the home.

9         62.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act

10   - the sweeping economic relief package was signed into law.

11        63.    On April 20, 2020, LabCorp announced that it was offering home testing for

12   COVID-19. Healthcare workers and first responders who had symptoms of COVID-19 could use a

13   LabCorp kit to self-test for the Coronavirus at home.

14        64.    On April 28, 2020, LabCorp announced that a test that helps identify individuals who

15   have been exposed to the COVID-19 Coronavirus and that it was broadly available.

16        65.    On or about May 11, 2020, President Trump announced that states would be receiving

17   $11 billion in funds from the Coronavirus Aid, Relief and Economic Security Act to help meet testing

18   goals.

19        66.    Routine Lab testing decreased substantially because of the shelter at home order. The

20   sales revenue in Plaintiff's territory decreased as a result.

21        67.    LabCorp made a new test available just for COVID-19. The test was able to detect

22   genetic material of the virus using a lab technique called polymerase chain reaction (PCR). This test

23   fell into the category of assigned specialty codes and test categories such that it would be included in

24   sales compensation calculations.

25        68.    Plaintiffs were introduced to this new potential revenue stream when Rajat Mehta, Sr.

26   Vice President for the West Division, said "let's turn this crisis into an opportunity."

27        69.    LabCorp immediately inundated commissioned employees with training information

28   and documents, both internal and client facing. For example, the employees were required to read and

---

**PLAINTIFFS' COMPLAINT**                                                          Page 17

understand long medical studies about COVID. One such study was "SARS-CoV-2: virus dynamics and host response" which was relatively long and complex. LabCorp wanted Plaintiffs to appear as if they were subject matter experts when talking to clients about COVID so Plaintiffs had to spend a lot of time learning in the middle of doing their work. Plaintiffs had to read and distribute handouts and materials about COVID, Q&As about COVID and similar things.

70.    Plaintiffs were required to read instructions about COVID specimen collection and shipping, guides about those tests, service announcements, and Q&A materials. They had to know more than average folks because LabCorp expected them to train clients about these matters. LabCorp required Plaintiffs to complete "Brainsharks" training about these and other COVID matters.

71.    Plaintiffs were instructed by their sales managers and upper-management to direct all of their sales efforts towards informing their existing clients of the test, updating their lab Electronic Ordering Systems with the COVID PCR test code for ease of ordering. Plaintiffs were tasked with providing all needed supplies to the clients.

72.    Plaintiffs set up dozens of new accounts, just for COVID testing (mainly County accounts, Urgent Cares, etc.) and navigated through all the logistics associated with these new clients. When a sales person sets up a new account for laboratory testing, the salesperson must provide a "connectivity solutions." Clients almost always ask for an EMR connection to place electronic orders and also receive lab results electronically (as opposed to mail or faxed results). Setting all of this up with the various EMR vendors (eClinical Works, NextGen, Epic, Practice Fusion ... just to name a few big ones) requires a lot of work by SMEs. Few clients decline an EMR solution, but they will at minimum use a free, online portal called "Link", which will provide patient results via the web. This is still a set-up that SMEs have to initiate and train the client to use and RMBDs oversaw this work.

73.    Plaintiffs were required to provide all of their clients with training on COVID test collection technique, storage, and causes for rejection.

74.    During phone and WebEx team meetings, Plaintiffs were told that the core/base business was down, and they needed to stay engaged with core business and try to sell them on Telehealth, LabCorp at Home (ship the kit to patients' home for collection - no need to go to Dr. office). Plaintiffs were also told that they need to go after new COVID business to sustain the

1  company while core business is down. Plaintiffs did as they were told and aggressively went after the

2  COVID business.  Plaintiffs worked 10-12 hours per day, 6 days per week. The results were

3  phenomenal.

4       75.    The requirement to learn more about COVID testing did not stop.  In May 2020, Area

5  Director Ted Turnure told Plaintiffs and others to read and familiarize themselves with a new study

6  about serology testing and to "start pushing this with all clients" and Plaintiffs were required to make

7  notes about conversations with clients regarding the new study.  This was for all clients.  Both

8  Plaintiffs had a lot of clients so this was a lot of work.

9       76.    Plaintiffs were required to do whatever it took to get new accounts.  For example, in

10  June 2020, Todd Benatar, Vice President and General Manager of NorCal/LA, told a client of Plaintiff

11  HULL that she would make a long-distance drive to ensure they had testing supplies, which she did.

12       77.    In or around June 2020, after Plaintiffs and other commission employees brought in

13  millions of dollars in business for LabCorp, the company suggested that it might not pay commissions

14  earned because they were too high.  The employees complained about this.  In response, LabCorp

15  schemed to commit fraud and theft by cheating Plaintiffs and other employees in California out of

16  commissioned earned. Managing agents of LabCorp fraudulently and falsely told Plaintiffs in a memo

17  that LabCorp was not required by law to pay the commissions earned and still owing.  In furtherance

18  of this fraudulent scheme, managing agent Mat Neighhoff (VP of National Sales Administration)

19  published a memo to ADBDs, ARMBDs, RMBDs and VPs stating that commissions would be paid

20  but only going forward, not retroactively.  This memo shows that LabCorp knew of its legal obligation

21  to pay all commissions and an intent to deceive Plaintiffs and others into believing that LabCorp had

22  the right to unilaterally alter commission agreements after commissions had already been earned. The

23  memo shows an intent to deceive some California employee paid by commission because it was not

24  shared with all employees and LabCorp did not pay Plaintiff Hull and others like her any commissions

25  and capped Plaintiff Schott's commission bonus.

26       78.    In June 2020, Todd Benatar, Vice President and General Manager of NorCal/LA, told

27  Plaintiffs to continue the efforts to grow COVID testing business and provided talking points for client

28  interaction when issues of delayed results arose.  Plaintiffs were told to say things like "as we reopen,

PLAINTIFFS' COMPLAINT                                                                Page 19

1  and routine medical care is restored, we are seeing substantial increase in the demand for COVID

2  testing" and because of the demand, we are experiencing delays" and "LabCorp has aggressive plans

3  to deal with the demand and lagging delivery times" and "we promise to stay in close contact with you

4  during the process."

5    79.    In July 2020, VP Mehta repeated his mantra and told Plaintiff and others "let's . . .

6  continue to turn crisis into an opportunity."  This was in the context of telling Plaintiffs what to say

7  to customers about delayed testing results.

8    80.    In July 2020, Rajat Mehta, Sr. Vice President for West Division, reminded Plaintiffs

9  and others to tell clients that Quest Diagnostics was experiencing delays in test results and that

10  LabCorp was doing better than Quest.

11    81.    For Plaintiffs, this was a very stressful and turbulent time. They were inundated with

12  phone calls,  questions, supply shortages, turn around time issues, and more.  They worked 12 hours

13  per day for several months in a row.  They were exhausted, but continued to get up and go at it day

14  after day.

15    **LabCorp Price Gouged The Government And Insurance Companies**
    **When Billing For COVID PCR Testing And Made Billions In Profit**

16

17    82.    The CARES Act (Sec. 3201) clarifies a requirement enacted in the Families First

18  Coronavirus Response Act, passed a week earlier, that commercial health insurance plans, including

19  out of network payors, must cover COVID-19 testing without imposing any cost-sharing on enrollees.

20  This allowed LabCorp to bill the government more than $51 and insurance companies $100 or more

21  per PCR test when the normal fee for each test would have been less than $10.

22    83.    LabCorp bragged, repeatedly, week after week, about the record- breaking revenues

23  that were being collected, particularly in the West Division.

24    **Despite Being Flush With Cash, LabCorp Refused to Pay**
    **The 7% Commission and Bonus Because It Was Just Too Much Money**

25

26    84.    In June or July 2020, LabCorp verbally told commissioned employees that it was

27  unilaterally changing the terms of employment contracts for commissions in exchange for sales

28  services.  The company announced that it would not pay any commissions for PCR revenue.  The

---

1  company claimed it was making a change to the Plan in order to make it more flexible because PCR

2  revenue was too high.  The changes were made retroactive.

3      85.    LabCorp said that it would exclude PCR revenue from sales compensation calculations.

4  The change eliminated all commissions for PCR revenue.

5      86.    LabCorp's decision to exclude PCR revenue from the sales compensation calculations

6  was unlawful and a violation of Labor Code §§ 226 and 2810.05.  The commission reports and pay

7  stubs that Plaintiffs received after the change were all inaccurate. LabCorp did not provide Plaintiffs

8  with a required notice of a pay change.

9      87.    LabCorp did not obtain anything in writing from Plaintiffs or other commissioned

10 employees regarding the proposed change to the employment agreement that promised commission

11 payments in exchange for sales services.

12     88.    LabCorp did not pay Plaintiff Hull and others the commissions earned from PCR

13 revenue. LabCorp unilaterally capped Plaintiff Schott's commission at 120% of goal even though he

14 achieved 354% in one quarter.  Plaintiffs should have been paid the full commissions earned on PCR

15 revenue.

16     89.    LabCorp did not eliminate any other form of revenue from the compensation

17 calculations under the Plan.

18     90.    Plaintiffs and the sales staff were shocked and outraged.  They never imagined that

19 LabCorp would refuse to pay commission from the work they did to sell the Covid PCR tests.  They

20 never imagined that LabCorp would change the commission agreement without their signatures.

21     91.    Plaintiffs felt like this was a big slap in the face when LabCorp manipulated the

22 revenue reports by removing the PCR revenue from their commission reports. They had worked 12

23 hours per day for several months in a row and were exhausted from selling COVID tests and growing

24 that business.

25     92.    The backlash from the entire sales team was instant.  Managers became concerned

26 because sales staff felt betrayed, the change would lead to a sense that Lab Corp management lost its

27 integrity, the change seemed to undermine LabCorp's promise, and the change was unethical.  As a

28 result, managers told Plaintiffs and others that there would be awards because they went above and

1  beyond in COVID sales. The managers called the payouts bonuses and the terms were extremely

2  vague. Plaintiff HULL's boss just kept telling her to keep working hard and that she would be paid

3  commissions as promised.

### LabCorp Engaged In Fraud To Cheat Plaintiffs
### And Acted With Conscious Disregard For Plaintiffs' Rights

6      93.    Before LabCorp unilaterally changed the terms of employment contract for

7  commissions in exchange for sales services, and before the company fraudulently excluded PCR

8  revenue from commission reports, the company, sales staff were unable to access sales and revenue

9  data. Commissioned employees asked the National Sales Admin office to explain. On July 2, 2020,

10  Ken Younts, the Vice President of Strategic Initiatives and Sales Operations, and Matt Neighoff, the

11  Vice President of National Administration & Sales Training sent an email to the senior sales

12  leadership stating that the preliminary commission reports for May 2020 would continue to be delayed

13  and falsely claimed that LabCorp had "encountered issues with the data concerning COVID testing

14  from various accounts" and said "a t this time we do not have an ETA on the reports" and LabCorp

15  would "provide additional information as soon as it is available." Zac Chambers, a manager in the

16  National Sales Admin office, sent the email to all sales staff. VP Younts, VP Neighoff and Manager

17  Chambers knew these statements were false when they made them. They knew there were no issues

18  with COVID data testing that prevented LabCorp from providing Plaintiffs and the others with

19  COVID sales data, and that the company would not be providing additional information because

20  LabCorp was conjuring a plan to cheat the sales staff out of COVID testing commissions.

21      94.    After LabCorp unilaterally changed the terms of employment contract for commissions

22  in exchange for sales services, and after the company fraudulently excluded PCR revenue from

23  commission reports, the company engaged with the sales staff during a conference call.

24      95.    During the conference call, questions arose. The first was about hiding the PCR

25  revenue data so that commissioned employees could not calculate what was owed. The second was

26  about whether LabCorp could lawfully change the terms of employment contract for commissions in

27  exchange for sales services without a signature from commissioned employees.

28      96.    An email response dated July 24, 2020, from a regional manager summarized

1 | LabCorp's responses to the questions, two of them were shocking:

2 |         1.        When Callidus reports come out, can reps get two versions? One
including [revenue for] COVID and one excluding [revenue for] COVID PCR testing?

3 |

4 | **We are not planning on creating a version including [revenue for] PCR testing.**
If we did, it would probably cause a bunch of headaches for you all as **some reps**

5 | **would go straight to the commission calculators and find out what that payment
would have looked like.** I'm sure that some reps have already done this using their

6 | APR/ACA reports but, **in conflict with our goal of being as transparent as possible,
this is probably one of those aspects that limited transparency is the best method.**

7 |         2.        When will the final comp documents go out to the teams and **will there
be a signature process**?

8 |

9 | **Legal is currently reviewing what we should do** for this situation but it wouldn't
surprise us if they come back and say that the memo suffices as communication of the

10 | plan change. **There is language in the compensation plans that essentially state
that LabCorp reserves the right to review and change the plan if something
unforeseeable happens and disrupts the harmony and intent of the compensation**

11 | **plan.  If new plans do need to be created and signed we will initiate that
communication with everyone.** . . . . (emphasis added)

12 |

13 |         97.        The email above falsely suggested that LabCorp would provide more information from

14 | legal about whether a signed agreement was needed.  The regional manager knew at the time that

15 | LabCorp would not be providing any more information.

16 |         98.        The email above shows that LabCorp consciously withheld key information about sales

17 | and revenue from sales staff and this was done to prevent them from calculating their commissions.

18 | The email shows that LabCorp knew it had an ethical obligation to be transparent with sales and

19 | revenue data, but it did not want sales staff using the revenue reports to calculate the commissions

20 | owed.

21 |         99.        The email shows that LabCorp knew that its actions were unlawful because it was

22 | making changes to the terms of employment contract for commissions in exchange for sales services

23 | without anything signed by the commissioned employees.  LabCorp knew that LabCorp's decision to

24 | exclude PCR revenue from the sales compensation calculations was unlawful and a violation of Labor

25 | Code §§ 226 and 2810.05.  LabCorp knew that the commission reports and pay stubs that Plaintiffs

26 | received after the change were all inaccurate.  LabCorp knew that it was supposed to Plaintiffs with

27 | a required notice of a pay change, because LabCorp had done this in the past.  There would be no

28 | reason to ask "legal" what should be done about signatures if this was not the case.

100.    The email shows that "legal" actually researched the issue of whether a signature was

required to change a commission plan.

101.    A legal professional at LabCorp or an outside law firm, more likely than not, entered

the words "does an employer adjustment to commission need to be signed" into the Lexis research

databases focused on California statutes.  Labor Code section 2751 appears as the number 2 search

result with these word being in plain view with the heading in bold blue letters:

> 2.    § 2751. Contract involving commissions; Duties of employer; Terms of expired
> contract
>
> CA - Deering's California Codes Annotated Cal Lab Code § 2751
>
> LABOR CODE > Division 3. Employment Relations > Chapter 2. Employer and
> Employee > Article 1. The Contract of Employment
>
> ... subd (a) by substituting (a) "By January 1, 2013, whenever an employer" for
> "Whenever any employer who has no permanent and fixed place of business in this ...
> ... (4) added "has the meaning set forth in Section 204.1. ' Commissions ' " in subd (c).
> 2012 Amendment: (1) Deleted "By January ...
> ... subd (c) which read: "(c) As used in this section, ' commissions' has the meaning set
> forth in Section 204.1. 'Commissions ' does not include short-term productivity
> bonuses such as are paid ...
> ... and profit-sharing plans, unless there has been an offer by the employer to pay a
> fixed percentage of sales or profits as compensation ...
> ... Whenever an employer enters into a contract of employment with an employee for
> services ...
> ... state and the contemplated method of payment of the employee involves
> commissions, the contract shall be in writing and shall set forth the method by which
> the commissions shall be computed and paid. (b) The employer shall give a signed
> copy of the contract to every employee who is a party thereto and shall obtain a signed
> receipt for the contract from each employee. In the case of ...
> ... terminated by either party. (c) As used in this section, " commissions" has the
> meaning set forth in ... (emphasis added)

102.    A legal professional at LabCorp or an outside law firm, more likely than not, clicked

on Section 2751 and read subsection (b) that says changes to commission pay must be signed by the

employee.

103.    A legal professional at LabCorp or an outside law firm, more likely than not, entered

the words "labor code section 2751" into the Lexis research national cases database, the first case that

pops up is Swafford v. IBM, 408 F. Supp. 3d 1131, 1134 (N.D. Cal. 2019). The legal professional,

more likely than not, "Shepardized" the Swafford case, and it would have led that person to the

decision in Beard v. IBM, No. C 18-06783 WHA, 2020 U.S. Dist. LEXIS 62796, at *19 (N.D. Cal.

1    Apr. 9, 2020).   Both cases clearly explain the problem with not having a signed contract for

2    commissioned employees.  They explain why reliance on cases decided in favor of IBM is not a good

3    idea.

4        104.    A legal professional at LabCorp or an outside law firm, more likely than not, advised

5    managing agents of LabCorp, including Chief Legal Officer Sandra van der Vaart that a signed

6    contract was required for commissioned employees and any changes must be signed by the employee.

7        105.    Despite all of this, LabCorp lied and told Plaintiffs and other sales staff that LabCorp

8    could lawfully change the commission without a signature of the employee.  LabCorp intentionally

9    told the sales staff that "legal" was involved to make it seem like the change was in fact legal, when

10   it was not and LabCorp knew this.

11       106.    Chief Legal Officer Sandra van der Vaart, more likely than not, made a decision to hide

12   the California signature requirement from commissioned employees because LabCorp did not want

13   sales staff asking questions about why California sales representatives had signed agreements and

14   others outside California did not.  van der Vaart did not want to alert the California sales staff about

15   their rights under Labor Code section 2751 so LabCorp lied.  Without the lie, Plaintiffs would have

16   been paid commissions for PCR revenue.

17       107.    LabCorp could have easily avoided this lawsuit by complying with the law and giving

18   Plaintiffs a signed commission agreement and making changes to that agreement only after Plaintiffs

19   signed the amendments.  LabCorp chose the unlawful path instead.

20                              **ADMINISTRATIVE EXHAUSTION**

21       108.    Plaintiffs  notified   the  California  Labor  and  Workforce  Development  Agency

22   ("LWDA") regarding  violations  of  the  Labor  Code.   Therefore,  Plaintiffs  exhausted  their

23   administrative remedies.

24                              **DAMAGES/PUNITIVE DAMAGES**

25       109.    As a proximate result of the Defendants' acts, Plaintiffs suffered and continue to suffer

26   substantial economic losses and interest thereon.

27       110.    Managing agents, officers or directors engaged in the acts and/or failed to do the acts

28   alleged herein above.  As a result, the Defendants, and each of them, engaged in fraudulent acts and

---

PLAINTIFFS' COMPLAINT                                                                      Page 25

1    conduct with malice towards Plaintiffs and/or a reckless indifference to statutorily protected rights and

2    in conscious disregard of the rights, both statutory and common law, guaranteed Plaintiffs by the State

3    of California. As such, Defendants are guilty of oppression and malice for which Plaintiffs are entitled

4    to punitive damages, in an amount to be proven at trial. Pursuant to law, the jury will be allowed to

5    award up to nine or ten times the underlying damages award, if any.

6                                    **ATTORNEY'S FEES**

7         111.    Code of Civil Procedure §1021 provides that attorneys' fees are recoverable in an action

8    for which they are specifically provided by statute. Labor Code § Labor Code §2699(g)(1) provides

9    that reasonable attorneys' fees and costs are recoverable herein, within the discretion of the court.

10   Plaintiffs retained attorneys for the prosecution of this action. As a result, Plaintiffs are entitled to

11   reasonable attorneys' fees and costs herein incurred. Plaintiff will amend to invoke this provision.

12                                **FIRST CAUSE OF ACTION**
                          **(Violation of the California Unfair Competition Law)**

13

14        112.    The allegations of paragraphs 1 through 110 are re-alleged and incorporated herein by

15   reference.

16        113.    Defendant is a "person" as defined under California Business & Professions Code

17   Section 17021.

18        114.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or

19   fraudulent business act or practices." LabCorp has engaged in unlawful, fraudulent, and unfair

20   business acts and practices in violation of the UCL.

21        115.    LabCorp's conduct, as described herein, was and is in violation of the UCL. LabCorp's

22   conduct violates the UCL in at least the following ways:

23             (A)    By knowingly misrepresenting to Plaintiff that LabCorp would pay commission

24   for sales revenue, including PCR revenue

25             (B)    By willfully failing to pay all earned commissions wages to Plaintiffs in

26   violation of Labor Code 201, 202, and 204., and

27             (C)    By failing to provide accurate wage statements as required by Labor Code §§

28   226 and 2810.05.

---

**PLAINTIFFS' COMPLAINT**                                                            Page 26

(D)     By including a North Carolina choice of law clause in the Plan that denied Plaintiffs the substantive protection of California law with respect to a controversy arising in California in violation of Labor Code 925(a)(2).

(E)     By including in the Plan a provision that permits LabCorp to frustrate the legitimate expectations of its employees, where, according to Defendant, it retains sole discretion to pay commissions or not.

116.    Where an employer's policy or practice is forbidden by or found to violate the Labor Code, it may also be held to constitute an unlawful business practice subject to redress under California Business and Professions Code § 17200.

117.    Furthermore, any failure to pay wages is, by definition, an unfair business practice under Section 17200.

118.    A practice could violate Section 17200 even if not specifically proscribed by some other law. To determine if a specific practice is proscribed in the absence of an express statutory directive, the Court is instructed to draw on its equitable powers. The discretion to pay commission or not provision is, in effect, an escape clause which Defendant may invoke to avoid the obligations it voluntarily incurred through the Plan. The clause may be invoked, moreover, after Defendant has received the benefit of the Plan in the form of successful sales of lab services which, absent the forfeiture provision, would lead to the payment of commissions under the Plan. Because the forfeiture provision permits Defendant to retain monies earned by its employees, it may be deemed an unfair practice under § 17200.

119.    Accordingly, Plaintiffs suffered injuries in fact including lost money as a result of Defendants' misrepresentations.

120.    LabCorp's misrepresentations alleged herein caused Plaintiffs to sell as many of LabCorp's products and services as they could, often at the expense of quality time with family that would not otherwise have been sacrificed had Plaintiffs known that LabCorp would not pay them the commissions he earned.

121.    As alleged above, Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within

1    this state and the contemplated method of payment of the employee involves commissions, the

2    contract shall be in writing and set forth the method by which the commissions shall be paid." The

3    statute also provides that an employer must give a "signed" copy of the contract to the employee and

4    obtain a receipt for the contract from the employee.  The statute also provides that the contract terms

5    are presumed to remain in full force and effect until the contract is superseded or employment is

6    terminated.

7        122.    Any claim by LabCorp that the Plan is not a contract, would be an admitted violation

8    of Section 2751.  If LabCorp admits that the Plan is a contract, the lack of a contract would not be a

9    sufficient basis for violation of the UCL, although violations of other parts of Section 2751 may be

10    a sufficient basis.

11        123.    A violation of section 2751, even if it cannot support a standalone claim, can serve as

12    a predicate violation for a claim under the UCL. Plaintiff alleges a claim against LabCorp for violation

13    of the UCL for its unlawful conduct in violating the provision of section 2751, as outlined above.

14        124.    Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by

15    Defendant under Cal. Bus. & Prof. Code § 17200 et seq.

16        125.    Plaintiff requests that this Court enter such orders or judgments as may be necessary

17    to enjoin LabCorp from continuing its unfair, unlawful, and/or deceptive practices and to restore to

18    Plaintiff any money it acquired by unfair competition, including restitution and/or restitutionary

19    disgorgement, as provided in Cal. Bus. & Prof. Code §17203 and Cal. Bus. & Prof. Code § 3345; and

20    for such other relief set forth below, including, but not limited to Plaintiff's attorneys' fees.

21                    **SECOND CAUSE OF ACTION**
                    **(Breach of Contract Required By Law)**

22

23        126.    The allegations of paragraphs 1 through 124 are re-alleged and incorporated herein by

24    reference.

25        127.    The contract for services with Plaintiffs was required by law pursuant to Labor Code

26    section 2751, which provides that:

27            (a) Whenever an employer enters into a contract of employment with an employee for
            services to be rendered within this state and the contemplated method of payment of

28            the employee involves commissions, the contract shall be in writing and shall set forth
            the method by which the commissions shall be computed and paid.

(b) The employer shall give a signed copy of the contract to every employee who is a party thereto and shall obtain a signed receipt for the contract from each employee. In the case of a contract that expires and where the parties nevertheless continue to work under the terms of the expired contract, the contract terms are presumed to remain in full force and effect until the contract is superseded or employment is terminated by either party.

(c) As used in this section, "commissions" has the meaning set forth in Section 204.1.

128.    LabCorp is an employer, and Plaintiffs are employees within the meaning of Section 2571. The company entered a contract of employment with Plaintiffs for services to be rendered within this state and the contemplated method of payment of Plaintiffs involved commissions.

129.    Plaintiffs agreed to provide sales services to promote LabCorp's goods and services. LabCorp promised to pay Plaintiffs a commission or commission bonus for sales revenue as mentioned above.

130.    The contract for services with Plaintiffs was in writing and set forth the method by which the commissions shall be computed and paid. However, LabCorp told Plaintiffs the writing is not a contract and, in fact, repudiated the contract even though it was required by law.

131.    LabCorp did not give Plaintiff a signed copy of the contract, nor did it obtain a signed receipt for the contract from Plaintiffs. The terms of the contract remained in full force and effect because the contract was not superseded nor was Plaintiffs' employment terminated.

132.    If LabCorp's claim, that the writing is not a contract, is true and correct, this conduct by LabCorp violated Labor Code section 2751.

133.    California courts have protected salespeople and routinely hold that if the employee is the procuring cause of the sale, he or she is entitled to the commissions. The term, "He who shakes the tree is the one entitled to gather the fruit" is used to describe the concept.

134.    LabCorp entered a contract of employment with Plaintiffs for services to be rendered within this state and the contemplated method of payment of Plaintiffs involved commissions.

135.    Plaintiffs agreed to provide sales services to promote LabCorp's goods and services. LabCorp promised to pay a 7% commission for sales revenue or bonus as mentioned above. Sales revenue included PCR revenue.

136.    The parties intended to form a contract and they performed their promises according to these terms.

PLAINTIFFS' COMPLAINT                                                                        Page 29

137. The parties documented the method for determining how the commission would be calculated in the Plan as described above.

138. The terms of the contract remain in full force and effect as there has been no meeting of the minds or agreement about any changes to the contract.

139. In July 2020, LabCorp breached the agreement by refusing to pay commission on PCR revenue because it was just too much money.

140. LabCorp unilaterally changed the terms of employment contract for commissions in exchange for sales services. The company announced that it would not pay any commissions for PCR revenue. The company claimed it was making changes to the Plan in order to make it more flexible because PCR revenue was too high. The changes were made retroactive. LabCorp said that it would continue to exclude PC revenue from sales compensation calculations. The changes were effective as to revenue generated in May 2020 and anytime after, so that no commissions would be paid in July 2020 based on the May revenue. The change eliminated all commissions for PCR revenue.

141. LabCorp did not obtain anything in writing from Plaintiffs or other commissioned employees regarding the proposed change to the employment agreement that promised commission payments in exchange for sales services.

142. LabCorp did not pay Plaintiffs in July 20200 for the commissions earned from PCR revenue in May 2020. Plaintiffs have never been paid the commissions earned on PCR revenue.

143. LabCorp did not eliminate any other form of revenue from the compensation calculations under the Plan. The company announced that it was unilaterally changing the way commissions were to be calculated retroactively.

144. As a matter of law, and pursuant to Labor Code 2751, LabCorp's attempt to change the terms of the employment contract for commissions in exchange for sales services was ineffective without something signed by Plaintiffs and against public policy.

145. LabCorp's conduct at the time of the breach was fraudulent. LabCorp consciously withheld key information about sales and revenue from sales staff and this was done to prevent them from calculating their commissions. LabCorp knew it had an ethical obligation to be transparent, but it did not want sales staff using the revenue reports to calculate the commissions owed.

146.    LabCorp knew that its actions - trying to change the contract without signatures - were probably unlawful. There would be no reason to ask "legal" what should be done about signatures if this was not the case.

147.    LabCorp actually researched the issue of whether a signature was required to change a commission plan, read Section 275 and read subsection (b) that says changes to commission pay must be signed by the employee, and read cases that clearly explained the problem with not having a signed contract for commissioned employees.  They explained why reliance on cases decided in favor of IBM was not a good idea.  Chief Legal Officer Sandra van der Vaart knew that a signed contract was required for commissioned employees and any changes must be signed by the employee.

148.    Despite all of this, LabCorp lied and told Plaintiffs and other sales staff that LabCorp could lawfully change the commission without a signature of the employee.  LabCorp intentionally told the sales staff that "legal" was involved to make it seem like the change was in fact legal, when it was not and LabCorp knew this.

149.    Chief Legal Officer Sandra van der Vaart, more likely than not, made a decision to hide the California signature requirement because LabCorp did not want sales staff asking questions about why California sales representatives had signed agreements and others outside California did not.  van der Vaart did not want to alert the California sales staff about their rights under Labor Code section 2751 so LabCorp lied.  Without the lie, Plaintiffs would have been paid commissions for PCR revenue.

150.    To the extent any part of the contract is against public policy, or unconscionable, the court should severe those parts from the agreement.   These matters are disputed questions of fact and law. For example, whether the parties intended to be bound on any terms, some terms or all terms will require the court to rule on whether such intent was lawful in the first place in light of Section 2751. The unfair terms of an adhesion contract should not be enforced, but the remainder of the contract can be enforced.  Then, the issue turns to whether LabCorp's subsequent conduct justifies a finding of intent to be bound.

151.    In doing the acts and/or failing to do the acts alleged herein above, the Defendants, and each of them, engaged in fraudulent acts and conduct with malice towards Plaintiffs and/or a reckless

1   indifference to statutorily protected rights and in conscious disregard of the rights, both statutory and
2   common law, guaranteed Plaintiffs by the State of California.  As such, Defendants are guilty of
3   oppression and malice for which Plaintiffs are entitled to punitive damages, in an amount to be proven
4   at trial.

5       152.    Code of Civil Procedure §1021 provides that attorneys' fees are recoverable in an action
6   for which they are specifically provided by statute.  Labor Code §2699 provides that, in addition to
7   penalties, reasonable attorneys' fees and costs are recoverable herein by the prevailing party, within
8   the discretion of the Court.  Plaintiffs retained an attorney for the prosecution of this action.  As a
9   result, Plaintiffs are entitled to reasonable attorneys' fees and costs herein incurred. Plaintiff will
10  amend to invoke this provision.

11                          **THIRD CAUSE OF ACTION**
                   **(Breach of Covenant of Good Faith and Fair Dealing)**
12

13      153.    The allegations of paragraphs 1 through 152 are re-alleged and incorporated herein by
14  reference.

15      154.    The law is clear; every employment contract contains an implied-in-law covenant of
16  good faith and fair dealing.  The covenant serves to guarantee that neither party will do anything to
17  frustrate the right of the other to receive the benefits of the agreement.  And where a contract confers
18  one party with discretionary power affecting the rights of the other, a duty is imposed to exercise that
19  discretion in good faith and in accordance with fair dealing.  If one party exercises its discretionary
20  authority in bad faith for the purpose of frustrating the other party's legitimate expectations, it has
21  breached the implied covenant.  Reasonable notice is part of fairness.

22      155.    LabCorp's decision to exclude PCR revenue from the sales compensation calculations
23  was a unilateral decision that took effect immediately, and without a reasonable amount of time and
24  no effort to ensure that commissions that had already been earned were paid to Plaintiffs.

25      156.    Plaintiffs and LabCorp entered into an employment relationship.

26      157.    Plaintiffs substantially performed their sales duties.

27      158.    LabCorp engaged in conduct that prevented Plaintiffs from receiving the benefits that
28  they were entitled to have received under the contract.

159. LabCorp did not act fairly and in good faith.

160. Plaintiffs were harmed by LabCorp's failure to act fairly and in good faith.

### FOURTH CAUSE OF ACTION
**(Fraudulent Misrepresentation)**

161. The allegations of paragraphs 1 through 160 are re-alleged and incorporated herein by reference.

162. LabCorp, through its agents, represented to Plaintiffs that they would be paid commission for all lab testing revenue including PCR revenue. Plaintiffs were told, by company executives, that they would be paid commissions for selling these services. LabCorp promised to pay, and actually paid, Plaintiffs a 7% growth commission on all revenue in excess of 100% of the 6-month rolling baseline. LabCorp and Plaintiffs used company databases and records of sales and revenue to calculate the commissions due Plaintiff. LabCorp made all of this information available to Plaintiff without limitation. This conduct by LabCorp and Plaintiffs shows an agreement or understanding that created an obligation for LabCorp to pay Plaintiffs and other commissioned employees the commissions owed.

163. Between 2016 and 2019, the parties conducted themselves consistent with this employment contract for services in exchange for the commission pay mentioned above.

164. Pursuant to the employment contract, LabCorp encouraged commissioned employees, including Plaintiffs, to sell as much as possible in order to exceed sales goals. The company has a "GEM Club" awards program for top sales personnel to receive recognition for making big sales and earning large commissions, gifts and all expenses paid trips and vacations. The GEM club announces top performers to all employees. The managers over commissioned employees often talked about "sky's the limit" when referring to commissions and the awards program. Top performers received bonuses in addition to the commissions. Plaintiff Hull was a top performer who exceed sales goals.

165. The parties documented the compensation terms of their employment contract. On an annual basis, LabCorp required Plaintiffs and other commissioned employees to sign a document entitled "Compensation Plan."

///

166.  The Plan for Plaintiff Hull describes the commission payments and method for calculating commissions. The Plan document says a 7% commission will be paid on all Sales Comp Revenue in excess of 100.0% of the 6-Month Rolling Baseline, and that revenue will be from assigned specialty codes and test categories, which included COVID PCR testing.

167.  The Plan for Plaintiff Schott describes the bonus commission he was to be paid quarterly.

168.  In March 2020. Plaintiffs were told this PCR test was a new potential revenue stream. They were immediately inundated with training information and documents, both internal and client facing.

169.  Plaintiffs were instructed by their superiors including the Area Director, Ted Turnure, and General Manager Todd Benatar, to direct all of their sales efforts towards growing LabCorp's COVID testing business.

170.  Plaintiffs were also told that they need to go after new COVID business to sustain the company while core business is down. Plaintiffs did as they were told and aggressively went after the COVID business. The results were phenomenal.

171.  LabCorp sat back and allowed Plaintiffs work above and beyond the norm. The result of this was big profit for LabCorp - billions of dollars from gouging the government and insurance companies. The company repeatedly bragged about how they were making record profits because of COVID testing and could have easily paid Plaintiffs pursuant to their Plans.

172.  In the midst of all of these communications, company executives told Plaintiffs and led them to believe that they would be paid commissions for PCR revenue if they built up the business.

173.  Those representations were false.

174.  Those representations were false when made and LabCorp, through its agents, knew that they were false when made. LabCorp intended to deceive Plaintiffs in making those misrepresentations. Simply put, LabCorp knew that it might not pay Plaintiff the commissions, even though it told Plaintiffs in all of these instances that they would be paid.

175.  Plaintiffs reasonably and justifiably relied on the representations of LabCorp. Notably, the representations were made at the same time Plaintiffs received written confirmation that their

1    employment agreement for sales services in exchange for commissions was continuing on the same

2    terms. Plaintiffs reasonably and justifiably relied on the representations by, among other things,

3    continuing to work hard and sell as much product and services as possible for the benefit of LabCorp.

4        176.    Had Plaintiffs known that he would not be paid what was promised and what was

5    expected, they would have worked differently at LabCorp, in commensuration with actual

6    compensation, and/or could have sought another job that paid w hat such efforts were worth and/or

7    did not refuse to pay commissions.

8        177.    Had Plaintiffs known that they would not be paid for PCR revenue, they would have

9    worked differently at LabCorp so as to maximize their compensation.

10       178.    LabCorp unilaterally changed the terms of employment contract for commissions in

11   exchange for sales services. The company announced that it would not pay any commissions for PCR

12   revenue. The company claimed it was making a change to the Plan in order to make it more flexible

13   because PCR revenue was too high. The changes were made retroactive. LabCorp said that it would

14   exclude PCR revenue from sales compensation calculations. The changes were effective retroactively

15   as to revenue that had already been generated so that no commissions would be paid for work that had

16   already be provided by Plaintiffs.

17       179.    Before Labcorp unilaterally changed the terms of employment contract for

18   commissions in exchange for sales services, and before the company fraudulently excluded PCR

19   revenue from commission reports, the company, sales staff were unable to access sales and revenue

20   data. commissioned employees asked the National Sales Admin office to explain. On July 2, 2020,

21   Ken Younts, the Vice President of Strategic Initiatives and Sales Operations, and Matt Neighoff, the

22   Vice President of National Administration & Sales Training sent an email to the senior sales

23   leadership stating that the preliminary commission reports for May 2020 would continue to be delayed

24   and falsely claimed that LabCorp had "encountered issues with the data concerning COVID testing

25   from various accounts" and said "a t this time we do not have an ETA on the reports" and LabCorp

26   would "provide additional information as soon as it is available." Zac Chambers, a manager in the

27   National Sales Admin office, sent the email to all sales staff. VP Younts, VP Neighoff and Manager

28   Chambers knew these statements were false when they made them. They knew there were no issues

PLAINTIFFS' COMPLAINT                                                                          Page 35

with COVID data testing that prevented LabCorp from providing Plaintiffs and the others with COVID sales data, and that the company would not be providing additional information because LabCorp was conjuring a plan to cheat the sales staff out of COVID testing commissions

180.    After Labcorp unilaterally changed the terms of employment contract for commissions in exchange for sales services on July 17, 2020, the company consciously withheld key information about sales and revenue from sales staff and this was done to prevent them from calculating their commissions. LabCorp knew it had an ethical obligation to be transparent, but it did not want sales staff using the revenue reports to calculate the commissions owed.

181.    After LabCorp unilaterally changed the terms of employment contract for commissions in exchange for sales services, and after the company fraudulently excluded PCR revenue from commission reports, the company engaged with the sales staff during a conference call.

182.    During the conference call, questions arose. The first was about hiding the PCR revenue data so that commissioned employees could not calculate what was owed. The second was about whether LabCorp could lawfully change the terms of employment contract for commissions in exchange for sales services without a signature from commissioned employees.

183.    An email response dated July 24, 2020, from a regional manager summarized LabCorp's responses to the questions, two of them were shocking:

> *1.    When Callidus reports come out, can reps get two versions? One including [revenue for] COVID and one excluding [revenue for] COVID PCR testing?*
>
> We are not planning on creating a version including [revenue for] PCR testing. If we did, it would probably cause a bunch of headaches for you all as some reps would go straight to the commission calculators and find out what that payment would have looked like. I'm sure that some reps have already done this using their APR/ACA reports but, in conflict with our goal of being as transparent as possible, this is probably one of those aspects that limited transparency is the best method.
>
> *2.    When will the final comp documents go out to the teams and will there be a signature process?*
>
> Legal is currently reviewing what we should do for this situation but it wouldn't surprise us if they come back and say that the memo suffices as communication of the plan change. There is language in the compensation plans that essentially state that LabCorp reserves the right to review and change the plan if something unforeseeable happens and disrupts the harmony and intent of the compensation plan. If new plans do need to be created and signed we will initiate that communication with everyone. . . . . (emphasis added)

184.    The email above falsely suggested that LabCorp would provide more information from legal about whether a signed agreement was needed.  The regional manager knew at the time that LabCorp would not be providing any more information.

185.    The email above shows that LabCorp consciously withheld key information about sales and revenue from sales staff and this was done to prevent them from calculating their commissions. The email shows that LabCorp knew it had an ethical obligation to be transparent with sales and revenue data, but it did not want sales staff using the revenue reports to calculate the commissions owed.

186.    The email shows that LabCorp knew that its actions were unlawful because it was making changes to the terms of employment contract for commissions in exchange for sales services without anything signed by the commissioned employees.  LabCorp knew that LabCorp's decision to exclude PCR revenue from the sales compensation calculations was unlawful and a violation of Labor Code §§ 201, 202, 204, 226 and 2910.05.  LabCorp knew that the commission reports and pay stubs that Plaintiffs received after the change were all inaccurate.  LabCorp knew that it was supposed to Plaintiffs with a required notice of a pay change, because LabCorp had done this in the past.  There would be no reason to ask "legal" what should be done about signatures if this was not the case.

187.    LabCorp knew that its actions - trying to change the contract without signatures - were probably unlawful. There would be no reason to ask "legal" what should be done about signatures if this was not the case.

188.    The email shows that "legal" actually researched the issue of whether a signature was required to change a commission plan.  A legal professional at LabCorp or an outside law firm, more likely than not, entered the words "does an employer adjustment to commission need to be signed" into the Lexis research databases focused on California statutes.  Labor Code section 2751 appears as the number 2 search result with these word being in plain view with the heading in bold blue letters:

2.      § 2751. Contract involving commissions; Duties of employer; Terms of expired contract

CA - Deering's California Codes Annotated Cal Lab Code § 2751

LABOR CODE > Division 3. Employment Relations > Chapter 2. Employer and Employee > Article 1. The Contract of Employment

.... Whenever an employer enters into a contract of employment with an employee for services ...

... state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and shall set forth the method by which the commissions shall be computed and paid. (b) The employer shall give a signed copy of the contract to every employee who is a party thereto and shall obtain a signed receipt for the contract from each employee. In the case of ...

... terminated by either party. (c) As used in this section, " commissions" has the meaning set forth in ... (emphasis added)

189.    A legal professional at LabCorp or an outside law firm, more likely than not, clicked on Section 2751 and read subsection (b) that says changes to commission pay must be signed by the employee.

190.    A legal professional at LabCorp or an outside law firm, more likely than not, entered the words "labor code section 2751" into the Lexis research national cases database, the first case that pops up is Swafford v. IBM, 408 F. Supp. 3d 1131, 1134 (N.D. Cal. 2019). The legal professional, more likely than not, "Shepardized" the Swafford case, and that would have led the person to the decision in Beard v. IBM, No. C 18-06783 WHA, 2020 U.S. Dist. LEXIS 62796, at *19 (N.D. Cal. Apr. 9, 2020).   Both cases clearly explain the problem with not having a signed contract for commissioned employees.  They explain why reliance on cases decided in favor of IBM is not a good idea.

191.    A legal professional at LabCorp or an outside law firm, more likely than not, advised managing agents of LabCorp, including Chief Legal Officer Sandra van der Vaart that a signed contract was required for commissioned employees and any changes must be signed by the employee.

192.    Despite all of this, LabCorp lied and told Plaintiffs and other sales staff that LabCorp could lawfully change the commission without a signature of the employee.  LabCorp intentionally told the sales staff that "legal" was involved to make it seem like the change was in fact legal, when it was not and LabCorp knew this.

193.    Chief Legal Officer Sandra van der Vaart, more likely than not, made a decision to hide the California signature requirement from commissioned employees because LabCorp did not want sales staff asking questions about why California sales representatives had signed agreements and others outside California did not.  van der Vaart did not want to alert the California sales staff about their rights under Labor Code section 2751 so LabCorp lied.  Without the lie, Plaintiffs would have

PLAINTIFFS' COMPLAINT                                                                                    Page 38

1    been paid commissions for PCR revenue.

2        194.    Plaintiffs were damaged by LabCorp's fraudulent misrepresentations.

3        195.    In doing the acts and/or failing to do the acts alleged herein above, the Defendants, and

4    each of them, engaged in fraudulent acts and conduct with malice towards Plaintiffs and/or a reckless

5    indifference to statutorily protected rights and in conscious disregard of the rights, both statutory and

6    common law, guaranteed Plaintiffs by the State of California.  As such, Defendants are guilty of

7    oppression and malice for which Plaintiffs are entitled to punitive damages, in an amount to be proven

8    at trial.

9        196.    Code of Civil Procedure §1021 provides that attorneys' fees are recoverable in an action

10    for which they are specifically provided by statute.  Plaintiffs retained an attorney for the prosecution

11    of this action.  As a result, Plaintiffs are entitled to reasonable attorneys' fees and costs herein incurred.

12                    **FIFTH CAUSE OF ACTION**
                **(Alternative Claim - Negligent Misrepresentation)**

13

14        197.    The allegations of paragraphs 1 through 196 are re-alleged and incorporated herein by

15    reference.

16        198.    Plaintiffs allege this claim in the alternative to the claim for fraudulent

17    misrepresentation.  The same facts from above apply to this claim.

18        199.    LabCorp owed Plaintiffs a duty of care in making these representations.

19        200.    Plaintiffs reasonably and justifiably relied on the representations of LabCorp.

20        201.    Plaintiffs were damaged by LabCorp's negligent misrepresentations.

21        202.    In doing the acts and/or failing to do the acts alleged herein above, the Defendants, and

22    each of them, engaged in fraudulent acts and conduct with malice towards Plaintiffs and/or a reckless

23    indifference to statutorily protected rights and in conscious disregard of the rights, both statutory and

24    common law, guaranteed Plaintiffs by the State of California.  As such, Defendants are guilty of

25    oppression and malice for which Plaintiffs are entitled to punitive damages, in an amount to be proven

26    at trial.

27        203.    Code of Civil Procedure §1021 provides that attorneys' fees are recoverable in an action

28    for which they are specifically provided by statute.  Plaintiffs retained an attorney for the prosecution

PLAINTIFFS' COMPLAINT                                                              Page 39

1    of this action. As a result, Plaintiffs are entitled to reasonable attorneys' fees and costs herein incurred.

2                                 **SIXTH CAUSE OF ACTION**
                        **(Alternative Claim - Quantum Meruit)**
3

4         204.    The allegations of paragraphs 1 through 203 are re-alleged and incorporated herein by

5    reference.

6         205.    Plaintiffs rendered valuable consideration to LabCorp, in the form of work performed

7    to sell PCR lab testing, for which they have not been paid. The consideration has a reasonable value.

8    The jury will determine the amount owed.

9         206.    At the time that Plaintiffs performed the work, they reasonably expected to be paid by

10   LabCorp. The company received and benefitted from the work with knowledge or reason to know that

11   Plaintiffs expected to be paid.  LabCorp voluntarily accepted the benefit of the work and kept the

12   benefits therefrom without waiving, refusing, or returning the benefit.

13        207.    If LabCorp claims that there is no contract between the parties or that it is

14   unenforceable, Plaintiffs are entitled under the doctrine of quantum meruit to recover damages from

15   LabCorp.

16                               **SEVENTH CAUSE OF ACTION**
                                  **(Unjust Enrichment)**
17

18        208.    The allegations of paragraphs 1 through 207 are re-alleged and incorporated herein by

19   reference.

20        209.    A promise which is reasonably expected to induce action or forbearance on the part of

21   another person, and which does induce such action or forbearance, is binding if injustice can be

22   avoided only by enforcement of the promise.

23        210.    At the specific request of LabCorp, and for its use and benefit, Plaintiffs have

24   performed work for LabCorp in the form of making sales of its products and services.

25        211.    The value of the work performed for LabCorp by Plaintiffs will be determined by the

26   jury.

27        212.    During and since the performance of the work by Plaintiffs, LabCorp has failed to pay

28   them and there is due and owing to Plaintiffs from LabCorp a principal sum amount of at least

---

**PLAINTIFFS' COMPLAINT**                                                                    Page 40

$249,765.

213.    Despite Plaintiffs being owed commissions, LabCorp has failed and refused to pay the same or any part of it.

214.    As a result of LabCorp's refusal to pay Plaintiffs the above-stated sum due and owing to them, LabCorp has become unjustly enriched.

## REQUEST FOR JURY TRIAL

Plaintiffs, ALLON HULL and CHRIS SCHOTT, hereby requests a trial by jury.

**WHEREFORE**, Plaintiffs pray as follows:

1.    For general damages in excess of the jurisdictional minimum of this Court, according to proof;

2.    For interest on the amount of losses incurred in earnings, deferred compensation and other employee benefits at the prevailing rate;

3.    For special damages according to proof;

4.    For punitive damages according to proof;

5.    For cost of suit, including reasonable attorneys' fees; and

6.    For such other and further relief as the Court may deem just and proper.

Dated: February 13, 2023                    BRYANT WHITTEN, LLP

                                            SHELLEY G. BRYANT, Attorneys for Plaintiff,
                                            ALLON HULL and CHRIS SCHOTT

PLAINTIFFS' COMPLAINT                                                    Page 41